We will hear argument this morning in Case 22-7466, Glossop v. Oklahoma. Mr. Waxman. Mr. Chief Justice, and may it please the Court, Richard Glossop was convicted on the word of one man, Justin Sneed, the undisputed murderer in this case. Oklahoma has now disclosed evidence revealing that Mr. Sneed lied to the jury about his history of psychiatric treatment, including the fact that a prison psychiatrist prescribed lithium to treat his previously undiagnosed bipolar disorder. The prosecution suppressed that evidence and then failed to correct Mr. Sneed's perjured denial, just as it suppressed evidence that in the middle of trial, in violation of the court's sequestration order, Sneed altered his testimony about the knife wounds on the victim at the urgent request of the prosecutor, who then falsely denied to the court her prior knowledge. There is no adequate or independent jurisdictional bar to review and no warrant for an evidentiary hearing. As to independence, the court's opinion is suffused with merits determination on the Brady and Knapp who claims, and certainly there is no, quote, clear and expressed statement that the court's decision is based on a bona fide, separate, adequate, and independent grounds as long required by this court to preclude review, nor is there any adequate bar. By rejecting the state's waiver, the court created a jurisdictional threshold it had never applied in any other case. The disposition was, quote, without support in prior state law as required by over 60 years of this court's precedent to establish adequacy. No evidentiary hearing could alter the conclusion that Mr. Glossop was denied due process. There's no dispute that contrary to Sneed's sworn testimony, the state's own suppressed record shows that he was in fact treated by a psychiatrist for bipolar disorder, just as there is no dispute that Sneed changed his testimony about the knife at the urgent mid-trial request of the prosecutor, who then falsely denied that very fact to the court. This court should reverse and remand for a new trial. I welcome the court's questions. Mr. Waxman, you placed quite a bit of weight on the notes from Smotherman and Ackley, and from your opening statement you clearly do not agree with them. Did you at any point get a statement from either one of the prosecutors? Yes. Did you interview them? Well, to be clear, we did get a sworn statement, which I believe is at page 960 of the joint appendix from Gary Ackley, in which, among other things, he never mentions the fact that he never mentions the account that he has now provided in the amicus brief for the Vantrese family. And as to Ms. Smotherman, Ms. Smotherman was interviewed both by the legislature's independent counsel and by the attorney general's independent counsel, Mr. Duncan. She gave different answers each time, none of which was the account she's now provided in an unsworn letter attached to the Vantrese brief. Well, it would seem that because not only, you know, their reputations are being impugned, but they are central to this case, it would seem that an interview of these two prosecutors would be central. They suggest that their interviews were generally about prosecuting capital cases and not specifically about the details of this. Look, their current unsworn statement appended at the very last minute for the very first time in a merits amicus brief before this court deserves all the benefit of the doubt to which they're entitled. In the context of Mr. Ackley did file an affidavit, it is in the record in this case, and it is not in any way consistent with his current account. Did they make themselves unavailable? Sorry to interrupt. Well, he made himself available. He provided us a declaration. No, what you're saying would make sense if for some reason they had made themselves unavailable. They suggest that they were not sought out and given an opportunity to give detailed accounts of what those notes meant and what they did during the trial. Justice Thomas, with respect, there is a reason why both independent counsels and the attorney general of the state credited the account of what those notes show and their own words, her own words on the notes can't be disputed. And the reason that they gave for that explanation amounts to the fact that in context, this is a prosecutor who, one, destroyed and dispersed material evidence both before and during the appeal of this case and during post-conviction proceedings. Two, she falsely told the court that it had complied with its obligation to provide the substance of all statements by Justice Sneed. Number three, they belittled the formal discovery request for mental health records as a, quote, fishing expedition and said that no such records existed. She, this is a prosecutor who engineered a mid-trial change in Justice Sneed's testimony and then denied doing so in the court and stood silent in the face of the false testimony that she elicited about psychiatric treatment. Mr. Waxman, the counsel appointed by the court argues that a central element of your case is that the jury would have regarded the matter differently if they knew that the lithium had been prescribed by a psychiatrist as opposed to someone else. Because the jury knew about the lithium and what they didn't know is that it was prescribed by a psychiatrist. Do you really think it would make that much of a difference to the jury? Well, I think that's not the only material difference here. The fact was not only that he was, that he lied and was allowed to lie when he said that he never saw a psychiatrist, which the defense, which, you know, it is one thing for a witness to stand up in court and testify on the basis of a promise of leniency by the prosecution. It's one thing for a witness to speculate or be inaccurate about what actually happened. What the jury is told, this is a witness who lied about the fact that he had seen psychiatric testimony and was diagnosed with bipolar disorder. And this is a witness who, at the mid-trial inducement of the prosecutor, changed his testimony about whether, in fact, he had also stabbed the victim. It very well could have made a significant difference in the outcome of the case. Mr. Waxman, the issue wasn't about him taking lithium. The issue was about why he was taking the lithium. Yes, of course. And so the fact that the jury knew he had taken lithium during incarceration doesn't tell them anything about whether he had a bipolar condition that his use of drugs would have led to impulsive and violent behavior, correct? That's correct. And would have explained the murder, correct? I'm sorry? And would have explained the murder. Now, can I go back to the two questions here? I have three of my own, okay? Okay. There's a lot, and you spent a whole lot of time in your introduction, a lot of spilt in here on whether the PCPA is an adequate and independent state grant. I'm not even sure why we're doing all that. You're right, the court below seemed to confuse the merits with the procedural bar. But it's very clear that a procedural bar is always waivable under Oklahoma law. Legions of cases say that, correct?  And under federal law. So once you waive, the only issue before the court was the substantive issue of whether there was a violation of federal law, correct?  So that's really the only issue before us. The procedural bar, a lot of spilt goes on and on about, is this the first time they didn't waive it? Is it not the first time they didn't waive it? The reason that's true is because they accept the waiver when there's a violation of a right, and they don't accept the waiver when there's no violation of a right. Here they found no violation of a right, so they reached the substantive legal issue, and said we're not going to waive. You don't find any case in Oklahoma law, and your adversary Mr. Waxman can tell me, where they found a constitutional violation, either under state or federal law, and said we won't accept a PCTA waiver. Can't find it because it doesn't exist. So now we're on the federal issue, okay? That's all I'm looking at. Was there an APOG? Was there a Brady violation? That's your argument, correct?  Now, on the Van Treece issue, that's non-record evidence. So it's not before us. It's not only not before you, it wasn't before the Oklahoma Court of Criminal Appeals. So whatever that was. Now, we know we had two independent counsels. At least one of them, if not both, talked to Gary Ackley, because he submitted an affidavit. Correct. And he said in that affidavit that Justice Sneed was on lithium as treatment for bipolar disorder would have been an important fact for the defense to know. Correct. So he concedes the basis of the APOG violation here, didn't he? Certainly the Brady violation. Right. Now, if he's changed his testimony now in unsworn materials, that's irrelevant to us here. And it's irrelevant to the finding the Oklahoma Court made below, correct? That's right. All right. So now let's go to the substance of the issue that the Chief raised, which was, could he have found this earlier? And does that make a difference to the APOG violation and the Brady violation? I thought the essence of the APOG violation is, was there a falsehood? Did the prosecutor know it was a falsehood? Not whether the defendant knew it was a falsehood, but whether the prosecutor has an obligation to correct it. Is that correct? It is correct that both the NAPU and its subsequent cases and Brady and its progeny both look to the obligation, the constitutional obligation of the prosecutor and not what the defense could have discovered. All right. We'll get back shortly to the Syrian question. Justice Alito. All right. Well, Mr. Waxman, Justice Sotomayor has taken us through the whole case, so maybe there's not much left to discuss. But I did have a few questions. The Oklahoma Court of Criminal Appeals said in paragraph 24 of its opinion, quote, even if this claim overcomes procedural bar, the facts do not rise to the level of a Brady violation. Why isn't that a quintessential clear statement under long, even if it does not overcome the procedural bar then, and it goes on then to the federal issue? Well, I think that the sentence you just read me is susceptible to at least two interpretations. One is the one you're applying, and the other is that they have just finished dispensing with a number of other claims in their opinion, all of which they very clearly unequivocally barred on state procedural default grounds. When they come to the Brady claim, the court says even if this claim overcomes procedural bar, I will then now spend the next four paragraphs, well, three of the next four paragraphs, discussing the merits of the Brady claim. And at a minimum, Justice Alito, I think we have to acknowledge that paragraphs 24 through 28, and this is repeated again at paragraph 41 and paragraph 12, that any statements by the court with respect to the state procedural bar are, to quote this court's precedents, interwoven with and influenced by its consideration of the federal constitutional  Why is that so? In paragraph 26, the Oklahoma court goes through the two requirements under state law, under 1089. The issue is one that could have been presented previously because the factual basis for the claim was ascertainable through the exercise of reasonable diligence. And then it goes on to the innocence requirement. And the facts are not sufficient to establish by clear and convincing evidence that but for the alleged error, no reasonable fact finder would have found the applicant guilty of the underlying offense or would have rendered the penalty of death. What's ambiguous about that? Justice Alito, there is no denying that the entirety of paragraph 26 is a near verbatim recitation of the two prongs of the state procedural bar. There is also no denying that it is preceded by two paragraphs discussing the merits of the Brady claim and succeeded by a paragraph, which also goes in, which goes in detail in explaining why the Brady claim. But what does that show? Yes, there's no dispute that they, they held in the alternative that there was no federal constitutional violation, but there is the Oklahoma statute. It has two requirements. They, they, they go through the two requirements and they say that they weren't satisfied and they say, even if it could overcome the procedural bar, it still would not provide a basis for, for relief. I don't see what's unclear or even ambiguous about that. Justice Alito, with respect, let me make two points. Number one, I guess maybe two and a half points. Number one, that when the court deals with the NAPU claim, which it does not address until paragraph 28, it never mentions procedural bar whatsoever. It is fully adjudicated on the merits. Number two, the, I think that, I think that one has to concede that at a minimum, a minimum with respect to the Brady claim, there is, it is certainly interwoven with, and it's physically on the page interwoven with what may or may not have been an adjudication of the state procedural bar. Certainly it was influenced by it. And this court 41 years ago in Long versus Michigan and reiterated 30 years ago, also in another opinion by Justice O'Connor reiterated that, and I'm quoting after long a state court that wishes to look to federal law for guidance as an alternative holding while still relying on adequate and independent state grounds can avoid the presumption of federal jurisdiction by stating clearly and expressly that its decision is based on bona fide separate, adequate, and independent ground. All right. Going on to another point, you rely very heavily on a note that says lithium question mark, Dr. Trumpet question mark. And you read a lot into that. And the van trees families amicus brief provides a pretty compelling counter reading of that. And you want us to say, well, just pretend it doesn't exist and read those notes the way we think they should be read. Those cryptic notes, the way we think they should be read because it's not the, the material that the van trees brief relies on is not in the record of the case. We shouldn't even remand for an exploration of this. As to the, I'll deal with the remand first and then the weight that ought to be given to the van trees briefs 11th and a half hour explanation of these notes. There is the, this case comes to you based on a holding of the Oklahoma court of appeals that did not have that account in front of it because the van trees family did not present it to the court and was predicated on a series of factual allegations and interpretations that were presented both by the prosecutor, the attorney general, and by Mr. Glossop and fully supported in great detail. And with reasoning by the two independent investigators that are done, I get your point. Your point is we shouldn't consider it because it's not in the record, right? That's the short answer. I think that you shouldn't consider it for a whole lot of reasons. One of which is that it is inconsistent is not only was never mentioned at a time when surely if it was the case, it would have been and is inconsistent with what Mr. Ackley says in his declaration. But let me, let me just say this justice Alito, even assuming that this account is true, there's no denying the fact. And it's also in the record that on while his first conviction was on appeal, he was visited in prison by Mr. Glossop's defense lawyer and an investigator. And that is clearly reflected in the notes of both Ms. Smotherman and Mr.  There are a lot of other things that are accounted for in those notes that have nothing to do with that interview. All right. And let me just, let me, let me go on to one other question because the time is limited. You read McCarty at 2005 case where the Oklahoma court of criminal appeals accepted the state's waiver of 10 89. You rely on that, but there is no reasoning in McCarty. The court simply said that in a footnote, the state expressly waived any procedural bar. Do you read this for the proposition that the Oklahoma court must accept all 10 89 waivers in future cases? I do. But even if I were wrong about that, and it reflected the fact that it was a discretionary rule, it is clear from this court's cases, beard versus Kindler and Walker versus Martin, that a discretionary rule is inadequate unless applied consistent with an intelligible principle that is quote firmly established and regularly followed and going all the way back to the 1960s. So one departure in the application of a discretionary, if it in a discretionary rule, if the rule is applied in a discretion in a, in a, in a habeas petitioner friendly way, in one case, that's the end of the matter. Well, I think that there, that there is a nondiscretionary rule, that that is the rule of party presentation that Oklahoma has followed for a hundred years. And McCarty is entirely consistent with that. But even if it were simply an instance of some discretion, again, this court said in, you know, 60 or 70 years ago, and has reiterated since that a declination, a state, the invocation of a state procedural rule, quote, without support in prior state law is inadequate. And in Johnson versus Mississippi, this court said, quote, a state procedural rule is not adequate unless strictly or regularly followed. Thank you. Okay. Justice Sotomayor. Counselor, no matter how we get past this, we have to reach whether the court ruled correctly on the constitutional issue. Correct? Well, I think so based on my, my position and the state's position that there is no jurisdiction. And everything that the Oklahoma courts have done. You said a hundred years of their history, party presentation, the fact that they've never had a case with a constitutional violation where they didn't accept the waiver. Correct. That's right. In fact, in this court, in the Oklahoma court of criminal appeals jurisprudence, there is a case cited by everybody Valdez versus the state, which says that the power to grant post relief post conviction when an error complained of has resulted in a miscarriage of justice or constitutes a substantive violation of a constitutional or statutory rights. So this is not a rule that the court is quote powerless to grant a waiver or that it does not. In fact, routinely defer to party presentation. So I go back to the, this is not at the correct. Our review is not at, did you say it's not at the review? Oh yeah, no, no, no, no, no, no. This is a straight Supreme Court. They reached the, they reached the constitutional question and we did no vote decide whether they got the law right. Correct. That's my understanding. So whatever they said, their reasons or thinking was, we have to look at the record and decide whether the facts and law support your argument that there were Brady and NAPU violations. Correct. Yes. Now tell me succinctly why even assuming their finding that they could have determined this issue earlier, Brady and NAPU violations would have occurred. Well, I say they meaning the court below. Yeah. So, you know, the part of the adequacy determination, leaving aside this novel and unforeseen refusal to give credit to the state's waiver of procedural bars is whether there is fair and quote, fair and substantial support for the prongs of the state procedural default. Here, the court's analysis of diligence, which is paragraph 27 of the court's opinion defies any reasonable application of state law. The supposition is that Mr. Glossop's lawyers should have brought a claim of constitutional error before they knew the salient facts, establishing the error. In this context, we have number one with respect to state law says about that. The question is what was federal law say about correct? Federal law, you know, maybe I'm missing something here, but federal law doesn't. I mean the federal requirement of adequacy and independence is federal law. And those, that definition of fair and substantial support understood my question. Okay. I apologize. I'm past the procedural bar. Okay. I was past it long ago because I think we need to get to the federal question. I hear you. All right. So even is there a Naipu or a Brady violation if they could have discovered this earlier? The answer to that question is yes, because the adequacy prong of this court's... Forget adequacy. Okay. The answer is yes. Let's assume they had granted your waiver. Okay. All right. Let's assume that. So adequacy and independence is not an issue. Under federal... And this had happened and it was the first case before the court. And they come up and they say there was a Naipu violation, there's a Brady violation. And your other side comes up and says, no, there wasn't, because you could have found this earlier. Okay. The answer to your question is twofold. Number one, as this court has said in several cases, Brady and Naipu do not stand for the proposition, stand for the opposite of the proposition, that the prosecution may hide and the defense must try to seek. That's the antithesis of what Brady and Naipu and their progeny provide. In addition, it is simply preposterous to argue either with respect to the document that is in... On page 1,005 of the joint appendix, that is the jail record, that this document could have been discovered in the face of a solicited denial under oath that he'd ever had psychiatric treatment and the state's mocking of a discovery request, number one, for the substance of all statements of justice need to the prosecutor, which is required not only by the due process clause, but also under state statutory law, Title 22, Section 2002A1C, which requires the prosecution to produce the substance of any oral statements made to the prosecution by a co-defendant. And how on earth could defense counsel have known that in Ms. Motherman's files there was a memo that she sent immediately after the medical examiner testified to Mr. Steed's lawyer saying, we, quote, need to get to Justin today. The knife is our biggest problem, and then received back handwritten notes discovered in Box 8 that, I guess it was Box 7, that in fact Steed was going to change his testimony and say that he did stab the victim. And the prosecutor then, in response to a mistrial motion, affirmatively tells the court, We're hearing this for the first time. The one fact you didn't mention is that there was a defense request for medical records. Absolutely. That were resisted by the government, and they succeeded. They never turned over his medical records. That's correct. So they had no way of determining from his medical records the lithium issue. Correct. Thank you. Justice Kagan? Yeah. Sorry. Justice Kavanaugh? Justice Jackson? So, from your colloquy with Justice Alito, it seems that there is agreement that the court, in this case, applied the procedural bar. Right? I mean, at least it's in the alternative, but they did actually apply the bar. Is that right? Arguably as to Brady, not as to NAPU. All right. So even with respect to Brady, I guess, doesn't that seem to be the problem, though, from the standpoint of AISG, when the bar has been clearly waived? I think that was Justice Sotomayor's initial point. Can parties in Oklahoma waive non-jurisdictional procedural bars? They can. Right. Of course. And what happens when those waivers occur? I mean, do the Oklahoma courts routinely proceed to either evaluate the reasons for the waiver or reject it and continue on anyway? I thought they just accepted. If a party says, this is a non-jurisdictional bar, I have a right to raise it, but I'm waiving that right, the Oklahoma court's standard practice, just like most courts, if not all courts, is to accept that and go on. Right? Yes. Like the federal courts, the Oklahoma courts honor the principle of party presentation and adversarial presentation in honoring the waiver of those non-jurisdictional practices. So we don't need a rule necessarily that Oklahoma always accepts these. They just do it. I mean, that's what, we don't have any evidence that they've ever rejected it, correct? The waiver. That's correct. In fact, the rule that this court applies on the adequacy prong is that it is, the refusal to accept a waiver is not adequate unless it has been done consistently in the past. Correct. Thank you. Thank you, counsel. Nothing. Thank you. Mr. Clement. Mr. Chief Justice, and may it please the court, Attorney General Drummond did not confess error here lightly. Indeed, he continues to defend multiple capital convictions and opposed Mr. Glossop's penultimate cert petition. But after commissioning an independent review, he reluctantly reached the conclusion that Brady and NAPU violations by the state's own prosecutors obligated him to confess error and waive procedural obstacles as his predecessor had done in McCarty. That confession demanded respectful consideration and resolution of the issues on the merits, as in McCarty. Instead, the court invoked procedural bars and essentially treated the confession of error as unfounded. The resulting decision made errors on two important federal constitutional issues, and those errors are not shielded by adequate and independent grounds. When the state's one indispensable witness was under bipolar, had bipolar disorder, and had bipolar disorder, the state's one  Mr. Clement, back to the prosecutors. If you had, if they were using a note of yours from 20 years ago, wouldn't you expect them to call you and have an in-depth investigation as to what your note meant? I mean, I would expect that, Justice Thomas. Well, shouldn't these two prosecutors, it seems as though their reputations are being impugned, and according to them, they did not receive an opportunity to explain in depth. Justice Thomas, that's hard to square with the record here. There were two independent investigations. As Mr. Waxman has indicated, Mr. Ackley submitted an affidavit under oath, and ultimately, I think the Attorney General, having commissioned a second independent review, looked at the results of that, looked at the notes, and he has to make his own judgment, because ultimately, the prosecutor has to decide whether a NAPU violation has occurred. Well, when I looked at the note of Ms. Motherman, I couldn't make heads or tails of it. It had a few names. It had lithium and a question mark, and she explains what it was. And according to her explanation, if it's true, it was simply about a conversation that Glossop's lawyer had with Steed. And if that's the case, I don't see how there's any basis for either of those two violations. So there's a couple of problems with that explanation, Justice Thomas. First, it's inconsistent with her earlier explanations for the notes. Second, when General Drummond is making this determination, the notes don't stand alone. There's also the medical information sheet that was never disclosed. What was that sheet? That sheet's at Joint Appendix page 933, and it shows that when he was transferred from the jail facility to the correctional facility, he was under lithium for bipolar disorder. So if we're looking at those notes in conjunction with that medical information sheet, it seems quite the inescapable conclusion that the attorney general had to make on his own. I think her point was simply, I mean, even that sheet, is that the sheet that she says the sheriff filled out, that it didn't come from actually from a doctor? Well, but it's the state's only record that at the point of transfer, he was A, under lithium, and B, it was for bipolar disorder. And so I mean, again, I think you ultimately have to draw the most plausible inference from all the information available. But you didn't, though. Her point is that you didn't ask her, that you didn't have an in-depth conversation with her about it. You're drawing it from the note, and what she thinks is inadequate information. Well, the attorney general is basing his judgment in part on the independent investigation of Mr. Duncan. He talked to Ms. Smotherman. Afterwards, Ms. Smotherman says it wasn't a sufficiently lengthy conversation. I mean, at a certain point, but let me put one more contextual point on the table here. The original request below was for an evidentiary hearing, and the state did not oppose an evidentiary hearing. Now, we think if you look at those notes in light of the medical information sheet, there's no need for an evidentiary hearing. But ultimately, we didn't resist it below. If the court had granted it, we wouldn't be here. And the attorney general just wants to get to the bottom of this, but he also, under NAPU, has to make his own judgment about whether the prosecutors have elicited perjured testimony and failed to correct it. And his best judgment, based on these records and this information, is that there was a NAPU violation here. But are you saying that the question of Brady and NAPU or a NAPU violation is resolved because the attorney general has reached that conclusion? Absolutely not. All right, so why wouldn't we send it back? I mean, it's my understanding. We'll send it back for an evidentiary hearing. It's my understanding that there's never been a court determination of any of these facts. Just as Thomas is saying, there's some disputes about what the notes mean and whatnot. So I guess I don't understand why we wouldn't, at the minimum, have some sort of requirement that a court make a finding about these things. I mean, look, again, we didn't resist an evidentiary hearing below. We would be satisfied if you vacate the judgment below and we would be satisfied if you did not vacate the judgment below. So I don't think there's a need for an evidentiary hearing. We do think an evidentiary hearing is not necessary here. Because I just think if you look at those notes in conjunction with the medical information sheet, there's no factual dispute. I don't think there's any factual dispute that certainly the two in  if you look at the law, anything in the prosecutor's possession, which includes prison records, the knowledge is imputed to the prosecutor, correct? Right. And ultimately, look, ultimately the question is, did she elicit perjured testimony and failed to correct it? And it seems like, especially when you look at it in conjunction of or in contravention of Oklahoma law and Brady, I think there's only one conclusion to be made here. And you can certainly understand why the attorney general, I mean, whoever is the if you think an evidentiary hearing is fine, is necessary, then the attorney general will be there confessing error again. Because as you can understand, given all the evidence here of the NAPU violation, the Brady violation, I mean, even under the most even under Smotherman's explanation that these are notes that she took based on what the what Snead told her, there's an obligation under Oklahoma law to turn over all the defense, all the all the witnesses statements. So any and especially in here, there was a request for it. I'm sorry. No, no. So so just looking at all of that material, the attorney general drew, I think the only conclusion that he could. Can I ask you, Mr. Clement, about some of the questions that Justice Alito was asking Mr. Waxman about whether there's an independent and adequate state ground here and really focus on these couple of pages of the Oklahoma court's opinion, which I find difficult to say the least, and ask you what you make of them. So a couple of things. One is I do think the easiest ground to say there is not an adequate independent state ground here is the waiver issue as opposed to splicing the opinion. If you're going to splice the opinion, you say the waiver issue. What do you mean by that? I mean that it is an established principle of Oklahoma law and federal law up until this point that party presentation, that procedural bars are defenses that the state has to invoke and can waive. And that is 100 years of unbroken practice. McCarty is a perfect example of that. In some respects, I think the fact that there wasn't an elaborate explanation that they were accepting the state's waiver is kind of the point. When the state waives a defense, you move on and you discuss the merits, which is exactly what the court did in the McCarty decision. This court's decision in trust against McCain, which was a unanimous decision, says that procedural default is a defense that the state must raise or it waives. So you just have this incredibly unbroken tradition that procedural defects, procedural bars are defenses that the state can waive. And here for the first time, they say, no, that's for us to do, not for you to do, Mr. McCarty. And suppose we want to go beyond that, because it is true that we rarely say that there's no adequacy because this is so out of the ordinary. It's a very rare kind of thing for us to say. And if we want to just look at what the Oklahoma court did in terms of justifying its denial of the decision of error and its determination to proceed, how do you describe what they did? Sure. I think it's easy as to NAPU, and it's a little more complicated as to Brady. As to NAPU, I think paragraph 28 stands alone. It's their only resolution of the NAPU claim. They don't talk about the procedural bars at all. There might be in that paragraph, the last sentence is an oblique, very oblique reference to the materiality prong of the procedural bar statute. Well, I read it differently. I read it as oblique reference to the materiality standard under NAPU. But if we're into the world of competing oblique references, that's when I think Justice O'Connor comes to the rescue and says that if you're not clear about it and it's ambiguous, then the federal issue is before this court And paragraph 27? Paragraph 27, I think, is where the court is wrestling with the Brady issue. I think it's pretty clear that's a Brady paragraph, not a NAPU paragraph. And then you get, like, that's all the way down, right, until the last sentence, which is the moreover sentence. And the moreover sentence might suggest, again, a reference to the procedural bar. Is that true? Moreover, as to the Brady, it says this issue, and I think that this issue there is Brady, and that's an inference based on the fact that the rest of paragraph 27 is all focused on what the defense counsel knew or should have known. And maybe that's marginally relevant for Brady, but it's completely irrelevant for NAPU. At the most, what you have here in these two paragraphs is very significant discussions of the substance, and then maybe a sentence about, oh, there's this procedural bar thing that we're doing, too. Is that correct? I think that's correct. The other point I would make... And, you know, in a way, this actually relates to the first point that you made about how unusual it is to deny the state's request for a waiver here, because that's sort of what they start with. They say they have these two claims, and the state has come forward and said this warrants post-conviction relief, and we're not accepting that because the state's concession is not based in law or fact. What do you take that to mean? I just mean, you know, I just take that to be the back of the hand to the confession of error. I mean, the state has only come forward with NAPU arguments and Brady arguments. Is that right? So they must be saying we're not going with the state because we don't agree with their views of NAPU and Brady, as we're going to now explain. I think that's a fair inference. I also think that one of the things that complicates this is, and maybe I read the one sentence a little differently than Justice Alito did, but they start with the Brady claim on the merits, if you will. And then in the context of that, they basically say there was no Brady violation here because you should have known everything you needed to know from the fact that he was taking lithium. And then I think that essentially infects the rest of the analysis about diligence and all of the rest. So I think this is a classic case where they are interwoven. But I will say, and maybe you'd think that the adequacy prong is so rare that it doesn't apply here, but this does seem to me to be a classic case for it because... Of interwoven, therefore not independent. Well, yeah, interwoven, not independent, but also inadequate because, gee whiz, this court unanimously has said, everybody has always said, look, if it's not jurisdictional, procedural bars are defenses that you can waive. Even this opinion isn't very clear about it. Paragraph 24 refers to 1089-D as a procedural bar. Is it possible that, you know, they know that they're doing something very unusual here, which is rejecting the state's request for a waiver, and they're just throwing everything in the kitchen sink in. They're saying, you know, we don't see the merits of these claims, either the Brady claim or the NAPU claim. They're saying there's this procedural bar statute hanging around, and we kind of think that that's been violated too. And we actually don't know. Like, if you took this piece out, if you took that piece out, how they would have come out. I think that is fair, and I think that gets you into Michigan v. Long and Coleman v. Thompson. I also think it is fair to say that what is clear is they have not accepted the state's procedural bar, the waiver of procedural bar defenses for the first time in the Court's history. Mr. Clement, whether a procedural bar must, whether the waiver of a procedural bar must be accepted by the Oklahoma Court is a question of Oklahoma law, right? The Oklahoma Court of Criminal Procedure, sometimes we accept them, right? It's definitely a question of Oklahoma law. And you have exactly one case, McCarty, for the proposition that this must, this waiver must be accepted. Exactly one. Can you cite one other case where we've deemed a state decision inadequate for conflicting with one prior opinion? I thought our decision said that there's inadequacy when they conflict with many, quote, past unambiguous holdings. So, at least according to the dissenters in Cruz, that was a case where you found inadequacy when there wasn't a single case on point, and it was a question of first impression. I would say, though, this, I mean, I think it's important to understand, McCarty does not stand alone. I mean, in addition to accepting the state's waiver in McCarty, the Oklahoma Court of Criminal Appeals on numerous occasions, Valdez, Malicote, both cases we cite in our briefs, they basically treat the bars as things that the court itself can relax or waive. And that is equally inconsistent with treating them as a jurisdictional requirement that can't be waived. That stands, again, against the backdrop of Oklahoma party presentation principles. This court decision in Trest v. Cain, the Tenth Circuit has treated 1089D as a procedural bar that the state can waive. And I think ultimately the question for adequacy, I mean, you know, this court's case, say, a rule is adequate, a state rule is adequate if it's firmly established and regularly applied. The question for inadequacy is whether it's an unexplained departure from past practice. Thank you, counsel. Justice Thomas, anything further? Just one point with respect to the transport order. I think my concern is that in their letter, the prosecutors say they did not see the transport order until 2022. So my problem is if they never saw it, then how is there a Brady or NAPU violation? So I think there's a Brady violation because whether they saw it or not, it was something that was available to No, they said it was not in their files. I don't think, I mean, let's keep in mind the precise dynamic we have here, right? This is, the interview takes place before the second trial. So Gloss, I mean, Sneed has been in state custody for close to five years at this point. He's been transferred from the jail to the correctional facility. I think the state is charged for Brady purposes with that transfer. But wouldn't it matter that whether or not they haven't, I mean, again, I go back to the prosecutors. What I'm hearing is, and they're hearing, is that they did not turn over Brady material or that they permitted false testimony to take place. And they're saying, look, it did not happen. And why wouldn't they be interviewed? Why don't we have materials from them other than in an amicus brief in this case? Well, with respect, Justice Thomas, you do have materials from them. Ackley's affidavit is in the joint appendix before this court. And it's not like Smotherman never talked to anybody. She's talked to people at various junctures, and her story has changed over time. Again, I don't want to overstate the point because we didn't resist an evidentiary hearing. But they are central to this. It would seem like any dealings with them would also be central. And we would not be arguing about NAPU and Brady if that had been cleared up. I mean, I think they would still be submitting amicus briefs with new stories. And at a certain point, you've got to deal with what is in front of you and what is in the record. And the Attorney General had to deal with what was in front of him and in the record. And particularly when you read the notes, in light of that sheet, all of which is in the record now, I think General Drummond made the correct decision. What did he do with the point that they make that they were frozen out of the process? They had access to both independent investigations. And I think at a certain point, I mean, if I were in their positions, I'd be complaining about the process as well. But the ultimate process that I think matters here is the process in Glossop's trial. And that was fundamentally distorted when he said, you know, I've never seen a psychiatrist who is allowed to make the lithium use innocuous by saying, oh, it's for common cold, and I've never seen a psychiatrist. Justice Leo? Justice O'Mara? At least one of the two prosecutors was interviewed in some way because we have an affidavit from him that was provided before the OCCA while this case was pending, correct? That is absolutely correct. Do you know, as a matter of fact or not, whether or not the first prosecutor, I can't say her name, Smotherman, whether she was interviewed? I mean, I know she was interviewed by Duncan, who is the independent prosecutor appointed by the attorney general. I think she also talked to people in the context of the Reed Smith independent investigation. But Mr. Waxman may be able to fill that in. So I'm having a hard time understanding what the current claim by both of them is. We weren't able to give our full story. They were interviewed, correct? My understanding is that they were interviewed. I think they do not think that the interview was as longstanding and as interactive as they'd hoped. As I say, I mean, you know, it's... But it wasn't as if they were boxed out. I don't believe that they were boxed out. And again, the attorney general... Can I go back to your respectful consideration to an attorney general's confession of error? And Justice Jackson asked you whether the court has to accept the confession of error, and you said no. And I think that's correct. The court, as I understand the rule of confession of error, it's especially relevant to questions of fact, correct? Not questions of law. The court has to be satisfied that there's a basis in law and fact for the confession, correct? I think as to both, it's respectful consideration, and I think it's at its zenith when it's prosecutorial misconduct. Because I think the prosecutors are in a particularly good position to judge what... I mean, you know, starting with what does Dr. Trumpet in the notes mean in the context of a community where everybody knows that Dr. Trumka is the sole psychiatrist at the jail? I mean, I think a prosecutor's going to have a good basis to say, yeah, everybody knows that's just some kind of shorthand for Trumka. That's an issue of fact. And the AG says, my prosecutor says, she didn't know. I'm not accepting that because she should have known. And I don't find it plausible in light of everything that I now have before me. And there's the question of what Smotherman had before in 2003. But now there's the question of... I mean, because I think the NAPU obligation on the government is a continuing one. So when they're looking at it, they're looking at the testimony that their prosecutor elicited. They're looking at that in context of the notes and the medical information sheet. And General Drummond reached the conclusion, regretfully, but reached the conclusion, our prosecutor's elicited perjury here, and a man's going to go to his death. We can't allow that to happen. Thank you. Justice Kavanaugh? And your view is that the result likely would have been different, right? We think the result would have been different with respect to the standard that's applied under Brady and under NAPU. Can you spell that out? I mean, I think it's obvious, but spell out why you think that. This is a case where there's just no disputing the fact that the state has one indispensable witness. That witness is Sneed. He's the person who committed the murder. He's the person until the police talked to him. Glossop was only charged as an accessory after the fact. So there's every indication this is the absolute critical witness. And if that witness lies on the stand and perjures himself on the stand, that seems to me that that could have a reasonable probability of leading to a different result for at least two reasons. One is this is the key witness, and the jury has just seen him under oath lie to their faces. And if that comes out, I mean, whatever other problems with his credibility that the prosecutors have at that point, they have a much bigger problem at that point. And without his testimony, there's no way to get the conviction of murder, let alone the death penalty. The second thing, though, of course, is that defense counsel, I think logically, if Sneed's testimony hadn't led him away from bipolar disorder, then they bring in a psychiatric expert and they make a big deal about how his confessed methamphetamine use combined with bipolar disorder makes him look like somebody who could act impulsively and violently. And that opens up a whole other defense for Glossa. Now, to be clear, I'm in an unusual position here, because General Drummond has not only confessed error, but he's made it clear that he's not going to drop this prosecution or doesn't accept that this is the poster child for an actual innocence case. And he intends to re-initiate criminal process. But I think he thinks that given the centrality of Sneed's testimony in this perjury, this is not a conviction that can stand. Okay. Thank you. Justice Barrett? I'm McCarty. So that is the only case, right? I mean, otherwise, it's party presentation for a long time, but not zeroing in on the procedural Barrett issue here. I just want to be sure I understand. I'm not trying to be hostile. And I'm not trying to be evasive. I don't view it as our only case, because I think Valdez and Malicote, both decisions of the OCCA, that treat it as non-jurisdictional, because they say the court itself can excuse 1089-D if there's manifest injustice or a serious statutory or constitutional error. And that's invoked even in paragraph 40 of the opinion here. So I don't think, the way I think of party presentation and all of that, I don't think that the court can have it both ways. If it's jurisdictional, it's jurisdictional, and nobody gets to waive it. And so that's why I don't think McCarty stands alone. And of course, we're talking about the standard is unexpected departure. Here's the attorney general's office. We got McCarty, but we got Valdez, we have Malicote, we have the Tenth Circuit saying 1089-D is a procedural defense that we can waive. In the fourth, let me make sure I've got the sequencing right, too. This is the Fed's post-conviction application, right? And in the fourth, they also refused to accept the confession of error and the waiver, right? That is true. So when the fifth came up, it wasn't as much of a surprise, right? I mean, why wasn't the attorney general ready at that point to say, you know, there's McCarty and you can't reject our waiver? I mean, look, in a perfect world, I mean, you know, maybe we would have done that. But in the real world, we thought we were waiving it. I mean, I know this is like in the weeds, but, you know, we expressly argue that the evidence is sufficient under 1089-C, which is the standard for the first habeas petition. So it's clear to everybody. I mean, you know, my friend and your friend, your court-appointed friend, says, well, maybe it wasn't clear enough to the Oklahoma Court of Criminal Appeals. But it was crystal clear to them that we were trying to waive it, and they weren't going to let us. And I think the fact that, you know, yes, it's two cases in the history of man, both involving this sort of lawsuit, I think that still puts us well within the addiction. The only thing I was going to add, and I know I said it before, but I think it's really powerful, is trust against Cain. This court unanimously says, yeah, of course. Procedural bars, procedural default, that's a defense. The state can waive it. And the state can waive it not just by intentional relinquishment, but by abandonment. That's wood against milliard. And, like, even if there's some question about whether we were sufficiently intentionally relinquishing it, we absolutely abandon it. So I just think this is a case where, and there's a systemic issue here, right? Because, I mean, it's Oklahoma law. They get to do what they want. But if Oklahoma is going to say you can't waive under these circumstances, it's going to create a whole federal courts exam about how it is that a state prosecutor is supposed to confess error when they discover a Brady or a NAPU violation after the first, like, state habeas petition has been filed. And, you know, I've tried to think through it all, and I think at the end of the day, it's a very simple question. But, boy, I don't... You don't have that issue. Well, you don't have it directly. And it's a lot harder issue than whether invoking this as an unwaivable jurisdictional bar for the first time in the history of man is adequate. I think that's a far easier question than the due process question about is there some ability to bring this kind of confession of error to some court somewhere and get to the merits. Okay. I want to ask you about the standard of review for looking at Smotherman's notes, because one of the difficulties, I think, with the notes is that putting aside whether the Ventre's brief is in the record, it's not. It still reveals that there are multiple plausible interpretations of the notes. So are we supposed to be applying a preponderance standard that we think it's most likely that they reflect that she knew about the psychiatric examination? I think that's right. I think it is a preponderance. Okay. And I think, not to be repetitive, but I think that's also the standard for the prosecutor, because the prosecutor in the first instance, I think you want them to confess NAPU errors. You want them to confess Brady errors. And I don't think you want them applying a clear and convincing standard or beyond a reasonable doubt. I think you want them to say straight up, if we blew it and there's a NAPU violation here, we should confess it. Justice Jackson? So just going back to Justice Barrett's question about whether McCarty is your only case, if I'm hearing you correctly, it is not because the principle that you're relying on is the fact that it is firmly established in Oklahoma law and procedure that non-jurisdictional procedural bars are waivable and the courts accept those waivers. They do it when a party waives a non-procedural jurisdictional bar. So it's pretty much every case in which a non-jurisdictional procedural bar has been offered and accepted by the court. Right? That's our view, and I think it's buttressed by the fact that the Valdez and Malico cases, even though they're not sort of confession of error or express waiver cases, they show the Oklahoma Court of Criminal Appeals treating 1089D as non-jurisdictional. Because if it's non-jurisdictional, they can't excuse it because of... Right. So it fits into the category of a non-procedural, a non-jurisdictional. Right. I think that part of the problem here that is what is confusing about Oklahoma's opinion is that they seem to be conflating what I think are two different bases for not applying the procedural bar. Right. One is the waiver, and the other is potentially the confession of error. In your discussion with Justice Barrett, you talked a little bit about Glossop 4, and in my reading of that, that was a situation in which there was a waiver expressly made, but I didn't know that there was also a confession of error. Am I right about that? You're absolutely right about that. In fact, it was the least confession of... I mean, it was the furthest removed from a confession of error. It's like there's a lot of chum in the water, and we just want you to decide the merits, but we think they are absolutely wrong. And so I think that's really important, because the prosecutor, I think, is actually making two different determinations that might be relevant to whether or not the procedural bar applies. The first is whether or not to waive it, which is what they do in Glossop 4. And the second is whether or not to confess error, which they go on to do in Glossop 5. And only the latter, the confession of error, is the one that might call into question the reasons for it, the court saying, well, you're confessing error, but let me figure out whether or not it's based in law and fact, and I'll only accept it under those conditions. If I'm right about that, then the real problem happened with it deviating from the ordinary practice of allowing parties to waive and accepting them. And that's why you said, I think, in response to Justice Kagan, that the waiver track is the easiest way to understand why we don't have an AISG here. Absolutely, Your Honor. And again, just in all candor to this court, I'm representing Oklahoma. Oklahoma in a lot of other cases is going to be saying that's adequate and independent state ground. But I think we want to be in a position where if we make a determination that there's been a constitutional problem with one of our prosecutions, we want to be able to confess that error and get to the merits. So I understand, but I don't want to conflate the two. I mean, when there is a waiver, courts don't ordinarily go into why you are waiving. You say, this is my right to press this procedural bar and I'm waiving it. And the court says, fine, we move on to the merits of the argument. What happened here, I appreciate. The attorney general goes on to explain the reason why he wants to waive it. It's the confession of error. But I don't think the court gets to reject the waiver if it disagrees with the confession of error, because waiver is a separate basis for relinquishing the procedural bar. I agree entirely. And I think ultimately, getting back to Justice Kagan's question, it may also explain why the opinion is sort of intertwined. Correct. Because they are sort of treating them as one and the same. In fact, I think paragraph 25 or 26 specifically says the confession can't overcome 1089D, which is perfect evidence that they've kind of conflated the two. Correct. Because the confession isn't what overcomes 1089D. It's the waiver that should, at least historically, everywhere but Oklahoma. Thank you. Thank you, counsel. Mr. Michel. Mr. Chief Justice, and may it please the Court, over the past 20 years, the Oklahoma Court of Criminal Appeals has reviewed and upheld Petitioner's conviction six separate times, finding compelling evidence that he commissioned the murder of Barry Vantrees. Petitioner now contends that the note, Dr. Trumpet? would have so transformed his case as to justify vacating his conviction. That is wrong. The Court below correctly rejected Petitioner's claims on adequate and independent state grounds, that he failed to show reasonable diligence or clear and convincing evidence of innocence. The Attorney General did not waive those bars in this case, and the Court was free to apply them in any event. This Court should accordingly dismiss the case for lack of jurisdiction, leaving Petitioner free to pursue state law clemency or other available relief. If the Court reaches the merits, it should affirm. The cryptic note does not establish any of the threshold elements of Petitioner's claim, and perhaps most clearly, the note is immaterial, because it adds nothing of substance to what Petitioner already knew. Critically, Petitioner has known since he received the competency report in 1997 that Justin Sneed took lithium and had a mental illness. But Petitioner chose not to question Sneed's mental health at the trial, because he knew that doing so would reinforce the prosecution's theory that Sneed was vulnerable to his manipulation. Nothing in the note would have changed that decision or the juries, particularly considering the extensive other evidence against Petitioner, including his motive to commit the crime and his cover-up of the body. The parties rely heavily on the Attorney General's confession of error, but courts, not executives, determine whether to vacate final judgments of conviction. The Court here decided the case on the law and the facts. This Court cannot ask for any more than that. It should leave the conviction in place. I welcome the Court's questions. What do you make of the absence of statements by the prosecutors in this record and the absence of Ackley's notes from the same meeting? I think, as the Vantrese family's amicus brief explains, it indicates that the investigation the Attorney General conducted here and the other independent investigations were not particularly thorough. I will note that the Ackley affidavit, this is at JA 940, says that he thinks the mental condition was disclosed to the Petitioner with the competency report in 1997. And I agree with that, and that's their witness who I think has conceded an important point against them. Mr. Michel, I asked, I forget whether it was Mr. Waxman or Mr. Clement, about your argument in the brief that all that's at issue here is whether or not the lithium was prescribed by a psychiatrist or by someone else, and that that alone was not sufficient to affect the jury's deliberations. Now, they had responses to that that elaborate on what they regarded as the significance of, not just who prescribed it, but the lithium itself. In other words, the bipolar determination, and we heard him emphasize that, contrary to what he had said, it's not simply for a cold. I wondered if you could respond to that. Sure, Mr. Chief Justice. I think materiality, I think this question goes to materiality. It's a comparative doctrine. You have to compare what was in the case before the new information, and then determine whether the new information would have made a difference. And I think in this case, that determination can be speculative in some cases. This is perhaps the rare case where the defendant's own conduct sheds considerable light on the importance of the information. After all, as I said at the outset, Petitioner has known since 1997 that Snead took lithium. And if you look at page J.A. 700, that's the Dr. King competency report, it says, does this patient have a mental illness? And the answer is yes, underlined exclamation point. If Petitioner thought that Snead's mental health was important to his defense, surely that would have been a bright red flag that he would have presented that defense at trial. And the notion that the marginal additional information that he was arguably based on the notes treated by a psychiatrist would have changed that decision, I think is difficult to reconcile with the record. I would also note the way you get from the notes, Dr. Trump at question mark, which I think my friends said they were able to do in a matter of hours because it was well known that Dr. Trumpka was the chief psychiatrist at the jail. They already had the road map to do it. Remember, the competency report says that Snead received lithium at the jail. They've had that since 1997. They could have simply gone to the jail and said, who's the chief psychiatrist? And they would have been told Dr. Lawrence Trumpka. And then they could have asked Dr. Trumpka the same question that they asked in 2023. And he would have said, well, if anybody treated Snead, I treated him. But they chose not to do that. And I think, one, that's overwhelming evidence of lack of diligence and that the state procedural bar is satisfied. But it's also overwhelming evidence on materiality, because Petitioner didn't do this out of negligence. He did it out of strategy. And that was because, as the Oklahoma Court of Criminal Appeals explained on page JA991, arguing that Snead had a mental deficiency or a mental illness would have reinforced the prosecution's theory that Snead was vulnerable to Petitioner's manipulation. And in a case where the entire case rested on the testimony of one person and his credibility, if you can show that he lied on the stand when he said, I never saw a psychiatrist and I didn't get a prescription from the psychiatrist. It was, you know, they gave me lithium for a common cold. And if you can show that he lied and doesn't, that seems pretty material to me. I mean, it's just your one witness has been exposed as a liar. A couple of responses, Justice Kagan. I think, first, there are threshold elements under NEPU, including whether this was false testimony. I don't think it was false testimony, but I want to take your question on its own terms. This false testimony that Snead saw a psychiatrist, that would have been harmful to Petitioner under his prosecution. False is false. You know, like whether you can like parse the content of the testimony this way or that way. The critical question that a jury is asking is, do I believe this guy in everything he says? And particularly, do I believe him when he points the finger at the accused? And if I know that he has gotten up to the stand and lied about anything, whether it's important or not, it might have been important. It might not have been important. If he's lying, if he's trying to cover up something about his own behavior, I'm going to take that into account in deciding whether when he accuses the defendant, he's telling the truth. Justice Kagan, I think in many cases where we were starting from the blank slate that the witness is presumed to be credible, one lie would be important. In this case, the witness admitted that he beat a man to death with a baseball bat. The witness admitted that he was testifying in exchange for avoiding the death penalty. The jury already had significant credibility questions about Justin Sneed. I find that an odd argument, Mr. Michelle. It's like this witness was so not credible anyway that we don't have to consider any further lies that he tells? No, what I think is difficult to understand is that the jury would have believed Justin Sneed and convicted Petitioner despite those problems, and yet because Justin Sneed saw a psychiatrist, according to the notes, the jury would have done a 180 and reached a different result. You know, a NAPU violation is a pretty dramatic thing. When a prosecutor says like, whoa, stop there, that was a lie. I think a reasonable jury takes that into account when it's like, wow, that was such a significant lie that the prosecutor had to sort of say stop. I don't think that would have happened in this case, given the distinctive nature of the witness that we're talking about. I also want to underscore that this is a tangential issue, that Justin Sneed testified for five hours. The question about lithium was about 30 seconds. What do we do with the other violations that the prosecutor committed? Presumably he lied about the ninth incident, which was provoked by the prosecutor and not his initial statement. There was withheld, a ton of other withheld information. Once you find a violation and you're deciding on materiality, are you entitled to ignore all that other evidence, having been improperly withheld? I know that it was in Glossa IV and prior rulings, the court didn't find any one of those a violation. But do we ignore it? Meaning, because we would be looking at this issue de novo, so does the calculus of materiality take into account everything? I think this is several steps down the road. I think you should dismiss the case for lack of jurisdiction. I'm asking you this question. Let's get to the end. We accept what Justice Kagan has said, that there was a falsehood. Now you're saying even if she knew about it, it wasn't material. At that point, because according to you, there was a falsehood. But does all the other withheld evidence that shows not just one or two lies, but a whole body of changed testimony, do we consider that? I do think the court has said in cases like Kyle's v. The state does not concede error on that point. The state discusses at length why it doesn't support his position on that. And that's actually the subject of the fourth postconviction relief application. But I do think that we know that he had an accomplice, a girlfriend, in prior robberies, and he never had Mr. Sneed present at the robbery, and yet there were two types of wounds. So it suggests the presence of the second person. And if it's not Mr. Sneed, then this robbery is much more consistent with his pattern. And that pattern was withheld from defense counsel. So that's why I'm asking about materiality. I mean, to be very clear, the pattern is not the knife. The question about the knife is the wounds on the body. No, I agree, but that's to do with whether there was one or two people involved. Mr. Michel, I do want to ask you about the adequate and independent state grounds, because this is unusual not to accept the waiver of the procedural bar. And, you know, you heard us talk about that with Mr. Clement and Mr. Waxman. What's your response to that? So, Justice Barrett, I actually don't think it's that unusual. That's partly because we have a very small sample size. As I read the cases, there's only one case in which the Oklahoma Attorney General has squarely waived the procedural bar, and the Oklahoma Court of Criminal Appeals has squarely addressed what to do with that. And that's the decision on the fourth post-conviction review application, in which the Oklahoma Court of Criminal Appeals, on page J.A. 775, said that it was not going to accept the Attorney General's waiver of the procedural bars. The Attorney General in this court, this Attorney General, told you that that was an adequate and independent state ground and that this court accordingly lacks jurisdiction over the fourth post-conviction relief application. So this decision, I actually think, does not actually address a waiver of a procedural bar, because the Attorney General, quite understandably, after he received that decision from the Oklahoma Court of Criminal Appeals, did not actually waive the procedural bar in this case. Instead, if you look at J.A. 976 and 977, the Attorney General says, quote, what Glossop has to do is meet the procedural bar. Then he goes on to describe the diligence prong and the innocence prong and why, in the Attorney General's legal opinion, those requirements are satisfied. But arguing that the requirements are satisfied is not the same thing as waiving the procedural bar. And in the one case where the Oklahoma Court of Criminal Appeals has addressed that, it has said that it doesn't have to accept the waiver. What about Mr. Clement saying that we have 100 years of practice and that this is just what the law is and procedural bars are always waivable, they're not jurisdictional? With all respect to Mr. Clement, I don't think you have 100 years of this. I think the one case he's pointed to, as several of the Justices pointed out, is the McCarty case from 2005. But why is that? Why are you making the sample size so small? I mean, I understand that that's the only case that involves an Attorney General who expressly waives a procedural bar, but procedural bars are waived of all kinds, are waived all the time. So why wouldn't what Oklahoma courts do when a procedural bar is waived, why wouldn't that be the universe of cases that we're looking at? Well, I think I would start with the statute that's before the court in this case. I think whether that bar... Are you saying that statute is a jurisdictional one? I'm not saying that statute is a jurisdictional one. All right, then we're into the world of non-jurisdictional procedural bars, and the question is what is Oklahoma's practice when a party, it doesn't have to be the Attorney General, it can be a party who could have invoked a non-jurisdictional procedural bar, what does the court do? I don't understand my friends to argue, perhaps this morning they did for the first time, that Oklahoma has an absolute rigid categorical rule trans-substantively across all areas that procedural... No, but we don't need that. We don't need that under Cruz. We don't need a rule that says we have to accept it. What we need is the practice of the court when this kind of thing happens. And so have you shown a case in which a non-jurisdictional procedural bar has been rejected? Absolutely. The one that's before you. Other than the one that's before us. We're trying to determine whether the one that's before us is a creation. Right, I'm sorry. The one, the fourth post-conviction relief application which is also before you... Not Mr. Glossop's situation. If you have a case that does not involve a person named Glossop, in which the court has rejected any non-jurisdictional procedural bar. Usually being able to cite a case that involves the same litigant seems relatively on point, but I don't, I think there's only one other case that has come before the Oklahoma Court of Criminal Appeals where the Attorney General has waived this procedural bar. That's the McCarty case. In three footnotes, the Court of Criminal Appeals observed that the Attorney General had waived the procedural bar, but it did not say it was deciding the issues for that reason. And in the 19 years since McCarty... Mr. Michel, you are avoiding the question. It was a pretty simple question. One case not involving this defendant in which a waiver has been rejected. I think there are three cases under this statute in which the court has seen waivers, arguably. In one of those, it rejected the waiver. In McCarty, it was ambiguous, and in this case it was also ambiguous. Not a case involving this, it doesn't, not a case involving this defendant, and we don't have to be in Attorney General Confession of Error land. Just one case where the Oklahoma Court says, even though a party wants to waive this procedural bar, you know, we're going to insist on opposing it. I don't, I have not canvassed Oklahoma law for all non-jurisdictional procedural waivers, but I think most courts, including this court, will exercise discretion to allow those waivers in some cases and not allow them in others. And as the court... Well, I'm just wondering what the right sample size is. When we're asking this question about whether this is adequate or not, should we be looking trans-substantively, or should we be looking just at this statute? I think you should be looking just at this statute. I think that's how the court has analyzed the adequacy cases in the past. And I think several important adequacy cases here are Beard v. Kindler and Walker v. Martin, where the court looked at... But the thing that's relevant about this statute is whether or not it's jurisdictional. I don't understand how the sample size could possibly be that small, because the question we're asking is whether it's waivable, right? So I understand we have a statute, and the question is, what does a court do when this procedural bar is waived? Fine. But are you rejecting the proposition that this is a waivable bar? I'm not rejecting that. So you don't say this is a jurisdictional statute? I'm not saying that. I think you could understand it that way, but that's not my position. But you're not saying that. All right. So you accept that this is waivable. And assuming... I understand your argument is that the Attorney General did not waive it. Right. But assuming that he did, for a moment, do you have any other reason to believe that Oklahoma's practice is to look at particular statutes and it rejects some waivers with respect to certain statutes and it accepts some... No, right? Well, I mean, I don't want to come back to it, but if you look at practice, you have the decision on the fourth application in this case, which is the only one in which the Court of Criminal Appeals has addressed this in a way that is relevant. Can I ask you about the independence prong? Sure. So the way I... This is very confusing, two pages to me. I've read it a dozen times and I'm still not sure what each paragraph is doing exactly, you know, what or where or why. But the first thing they say is, you know, the state has come to us and has said, you know, we're not going to accept that concession, is what they call it. And the concession that they're referring to is the concession that he warrants post-conviction relief, right? And what the state has said in its, you know, concession, as they call it, focuses on NAPU and why it is that NAPU supports NAPU, right? And it says, the state's concession is not based on law or fact. And that's what gets it to everything else that it does, right? Because first it has to reject the concession and it says, not based on law and fact, essentially meaning that the state's NAPU argument is wrong. So before it gets to anything that might be conceived of as a procedural bar, what it has said is that the state's NAPU argument is wrong, correct? I think that's one potential way to read the opinion. I agree with you. It's not polluted in all respects, but I do think it's pretty polluted in paragraph 26. If that's one way to read the, the only way that they go through the door to start talking about procedural bars is because they say that the state's NAPU argument is wrong, you know, they wouldn't have gone through the door except that they made this error of federal law. So this is all founded on an error of federal law. The error being that the state's concession based on NAPU is, is, is incorrect in law. I don't agree with that, Justice Kagan. I agree that that sentence comes earlier in, in the opinion, but I did not mean to agree that as a substantive legal matter, the court had reached the NAPU issue before it was applying the procedural bars. I recognize that it's conceivable this opinion could have been written more clearly, but I do think paragraph 26 is pretty darn clear when it applies in terms of procedural bars. You would never get to paragraph 26 except for the prior determination that the state, that the state's concession is wrong, which has to be a determination on the merits, even if that's not the case. Let's say that I've just made it a little bit too neat that you have to have that the state is wrong with the merits in order to go into the procedural bar analysis, even if that's too neat. I mean, like there are sentences in this opinion, one, one sentence we're talking about the merits, one sentence we're talking about the procedural bar. It keeps on going back and forth. How, how on earth could one reach a conclusion that this, that the court would have done exactly what the court did if the court had a different view of the merits? I mean, everything was intertwined with everything else here. Well, I mean, just to respond to your prior question, and I think this one too, if it's true that the court had resolved the issue on federal law, I'm not sure what paragraph 26 is doing in the opinion. I mean, there's no reason to address the procedural bars at that point. And another thing. Yeah, well, but I actually think the reason it's in the opinion is because the court is applying the procedural bars there and that your inference, respectfully, is not a correct reading of it. I'm sorry. They have to decide the claim was based on federal and state law. So they might have been going to it based on the state law, but please continue answering. The procedural bars are a state law threshold, reasonable diligence and clear and convincing evidence of innocence, unless the threshold is not the way these two pages are written. I mean, it would be very easy to say before we get to the merits, the procedural bar is a state. I mean, that's so not the way these two pages are written. Justice Kagan, it starts with the substantive standard. Then it tells you that the state's concession is wrong as a matter of law. Then, by the way, it tells you some stuff about the procedural bar standard. Then it goes back to the merits again. Justice Kagan, you've issued a strong legal writing critique of this opinion, but this opinion was issued. I haven't even started. The question under this court's independent and adequate state ground doctrine is not how well-written the opinion is. No, but actually, it's totally right. It's not how well-written it is, but it's a high bar to say that something is independent. You know, if there's ambiguity, if there's uncertainty, we do not give that benefit of the doubts to the state under Michigan v. Long. Quite the opposite. Justice Kagan, with respect, I think you were striving for ambiguity where there is clarity in paragraph 26. Paragraph 26 says- Paragraph 26 is number one, one paragraph of six or seven, right? So, I don't think that you get to just say, this is my best paragraph. You have to look at the analysis and say, is it intertwined or is it independent? And, you know, all paragraph 26 does is to state a standard. It's like, okay, we know that they thought that this standard had something to do with something, but the rest of the two pages is, like, totally merits-infused. So, I have to respectfully disagree. 26 does not state a standard. It applies the standard and says it's satisfied. Paragraph 27, in particular, if you look at the last sentence, it says, moreover, and controlling here is the fact that this issue could have and should have been raised with reasonable diligence. That's a direct invocation of the bar. I agree that there are other paragraphs in the opinion addressing a federal law issue, but as this court held squarely in Harris v. Reed, state courts were allowed to issue alternative holdings, one on the state law and one on the federal law, and that does not mean that the state law holding becomes immune from the adequate and independent state ground doctrine. As the court said in Coleman v. Thompson, it's ultimately looking for a fair, reasonable reading of what the court did. And this court, reviewing this case for the sixth time, with a looming execution date on the calendar, trying to decide this quickly, trying to provide reasons for the parties and the public in a case of high public interest, did address both the procedural bar and the merits, but I think in paragraph 26 and 27, it does squarely, independently, and adequately apply the state procedural bars. That means this court lacks jurisdiction. It doesn't mean that Petitioner has no other remedies available. He has the state law clemency relief available to him. My understanding is that this court dismisses for lack of jurisdiction or affirms on the merits. His execution will be rescheduled. There will then be a clemency hearing scheduled. He will be able to present his views to the clemency board. Of note, the clemency board has changed in its composition since the last clemency hearing. The member of the board who was recused is no longer on the board. That member has been replaced. Another member of the board who voted against clemency is also no longer on the board. That member has been replaced, so it's a new board. Sorry, Justice Gabbard. So you talk about a fair understanding of what the court did. Can we go to the understanding of what you think the AG did here? I understood from your argument that you said that the AG did not waive the bar in this case. And I'm just trying to understand how that could possibly be when he confessed error and asked for the conviction to be vacated on the grounds of the merits of the NAPU claim. If he was also asserting the procedural bar, I don't understand how he's making arguments about the merits. Not in the alternative. He doesn't say, and in the alternative. He doesn't say, I'm invoking the procedural bar, but if you somehow think it's overcome, let me go on. Well, I would look at JA 976. He said, to obtain post-conviction relief, Glossop needs to show that the issue could have been raised in a direct appeal and supports the conclusion that the outcome of the trial would have been different, citing the procedural bar. Then he says, at a minimum, Glossop was not made aware of Snead's treatment. That's the diligence prong. Then he says the state is also not comfortable asserting that the outcome would have been different. That's the innocence prong. Does he also say, I'm incorporating my arguments from Glossop 4, where he expressly waived? He says, I'm incorporating my arguments from Glossop 4. But remember, in Glossop 4, he said, I expressly waived for this case, but I will expressly invoke the bar for future cases. Enough is enough. And the Oklahoma Court of Criminal Appeals, in that case, told him that he wasn't allowed to waive. So I think it's quite responsible for the Attorney General to not waive. But maybe the Oklahoma's courts telling him he's not allowed to waive explains why he goes through the procedural bar, but it doesn't explain whether or not he intended to invoke it. In other words, it seems odd to me that he would be talking about the merits of this claim, trying to get the conviction vacated, but also still invoking the procedural bar. And the oddity, it seems to me, is explained by the previous attempt to waive the procedural bar that was rejected by the court. It was sort of like law of the case, and so he's talking about it in 5, because the Oklahoma court has already said, don't talk to us about the waiver. I mean, I think we have a point of agreement, which is that after the Oklahoma court told him that he couldn't waive, which is, after all, a state law issue, then he didn't waive. He said the bar is satisfied, and he revealed the merits. Don't we have to credit his intention to waive in this case, which he expressed clearly in 4, and was told by the court he couldn't. And so I understand that your argument that he doesn't waive in 5 is, you know, he doesn't make an express waiver statement, but of course he doesn't, because the court already told him he couldn't waive. Well, two points. It was his predecessor in 4, not him. And in all events, the fact that the Oklahoma court told him he couldn't waive is strong evidence that the Oklahoma court, as we discussed earlier, doesn't always accept the Attorney General's waivers. I mean, remember, we're talking about the state court. No, no, no. I'm asking you, isn't it evidence that he expressly intended to waive? No. The fact that he argued that the bar was satisfied is not evidence that he expressly intended to waive. Thank you. Thank you, Counsel. Justice Thomas? Justice O'Leary? Justice O'Mara? Justice Kagan? Justice Kavanaugh? Yeah. I think you had said earlier, and I want to explore, if you get past all the procedural bars, and you get to the point where the prosecutors didn't comply with their obligations, that it still wouldn't have made a difference to the jury had they known that Sneed was bipolar and that he had lied on the stand. And I'm having some trouble on that last piece of the argument, if we get there, understanding that when the whole case depended on his credibility. Can you explain that some more? Yes. And one of the critical arguments in the case, if you read the closing arguments, for example, there's extensive discussion about whether Petitioner was manipulating Sneed. That's probably the issue that comes up the most in the closing arguments, which are not evidence, but are a reflection of what was at issue in the trial. And therefore, Petitioner's strategic decision in this case not to question Sneed's mental illness, I think, was informed by the fact that he didn't want to support the prosecution's theory. And as this court explained, for example, in Wood v. Bartholomew, you can infer from the strategic decisions of the defendant what was material, what was important in the case. If the defendant himself, who has every incentive to raise the arguments that are best for him, doesn't want to raise arguments about Sneed's mental health, that is a strong clue, a strong indicator that it's not material, at least material in the sense that it would change the result in his favor. It may have made the conviction more likely, but of course that's not what he needs to show for materiality. Would it have made the conviction more likely if the jury knows that not only does he have an incentive to lie, that he's lied on the stand and that he's bipolar, therefore creating all sorts of avenues for questioning his credibility? I think that the Oklahoma Court of Criminal Appeals explained on page JA991 that evidence that would have furthered the prosecution's theory that he could be manipulated, that he had a mental illness, would have undercut his theory and would have made the conviction more likely. Now, I do want to underscore there's lots of other evidence in the case against Petitioner that doesn't relate to Sneed, including his motive, including his possession of cash, including the fact that he was the only one who knew where the money would be found. And I think most importantly, his elaborate 24-hour cover-up, which cannot be explained by anything having to do with Justin Sneed's mental state or whether he had a psychiatrist or whether he had bipolar. That would be, I think, the second most prevalent issue in the closing arguments. And so I think it's difficult to say the jury would have rejected Petitioner's central defense that he was only an accessory after the fact and yet turned around and accepted it if only it knew that Justin Sneed allegedly saw a psychiatrist. Thank you. Justice Barrett? Justice Jackson? There seems like there's some pretty significant factual questions that have been debated. You know, what did counsel know? What did these notes, markings mean? Was Sneed's statement that he never saw a psychiatrist true or false? Would you object to an evidentiary hearing? As I understood it, no court has ever actually made findings on those things. I'm not even really sure if I have standing to object to an evidentiary hearing. You know, I don't think it's necessary. I guess we all agree that it's not necessary. They say we can look at it and rule in your favor. I mean, they say we can look at it and rule in their favor. But I'm just trying to understand, don't we have to have some? Maybe we don't. I mean, I don't want to dodge your question. I think you can dismiss and should dismiss the case for lack of jurisdiction because of the adequate and independent state grounds. If you do that, you don't have to worry about the facts. Right. If we disagree with that, if we're getting to the merits, how should we go about deciding whether there was a Brady or NAPU violation here? I think you should start with the premise that it's petitioner's burden to prove the Brady and NAPU violations. And based on the evidence that he's chosen to present, and particularly given that he's now told you he wants the case decided on the current record without an evidentiary hearing, I think the proper conclusion would be that he's failed to satisfy his burden. And thus, if you reach the merits, you should affirm the judgment below. Thank you. Thank you, Counsel. Rebuttal, Mr. Waxman. Thank you, Your Honor. I have a few short points. Number one, there is nothing that will come up at an evidentiary hearing is going to avoid the imperative, the necessity for a new trial for due process violations. If you look at the J.A. 1005, which is the jail medical report, there is no world in which that report, which was suppressed by the defense, by the prosecution, is not Brady material and highly, highly relevant impeachment material. If you look at page 953 of the joint appendix, these are the notes, the Smotherman mid-trial note, we have to get to Justin right away. The knife is the biggest problem. There is no way that those suppressed notes, number one, don't reflect a NAPU violation, and number two, are not Brady material. And with respect to the meaning of the Smotherman notes, even if you were to take the complete extra record explanation of this, which, and yes, Mr. Ackley and Mr. Smotherman were both interviewed by both independent investigations, Mr. Ackley has a declaration which in no way suggests that when he says that he was told by Snead about taking lithium, and when he was told about the discrepancy in the jail medical records, that it had to do with a relating of questions the defense counsel had had, Ms. Smotherman said when she was questioned, number one, I'm not sure that Trumpet is Tromka. Explanation number two, I was referring to Dr. Trumpet, a jazz musician I wanted to hear. That was a personal note. And so when, in any event, even if she's right, that all Snead said was, I was questioned by the defense and I told them that I was prescribed lithium by Dr. Trumpet, given the obvious fact that this prosecutor for Oklahoma County knew as well as everybody else that Dr. Tromka was the only jail psychiatrist, she committed a NAPU violation even under the VanTrees law. And so that's why I'm asking for this brief extra record explanation. Now, there was a question about, I think, Justice Thomas, it was yours, but pardon me if I misallocated it, about, well, the jail records, like they were in the prosecutor's file. The jail records are clearly Brady material. They were under this court's decision in 2013. So what is in the jail records is not what is in the prosecutor's file, but what is also in the police and investigators files. That is an obligation that the prosecution has. And they were in the sheriff's office files. The sheriff's office ran the jail. The sheriff's office was investigated this crime. A deputy sheriff was called by the prosecution to report on his investigation. And Mr. Ackley, at paragraph 26 of his declaration, page 939, says that he knew about jail records and misapplications. Thank you. Thank you, Mr. Waxman. The case is submitted.